UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

STEVE L. WILLIAMSON,
                              Plaintiff,

            -v.-                                      9:02-CV-0521
                                                     (GLS/GHL)
GLENN S. GOORD, Commissioner of DOCS;
LEONARD A. PORTUONDO, Superintendent;
CAPT. CONNOLLY; DR. FORTE; and
C. CORNELIA, Nurse,
                              Defendants.

_____

APPEARANCES:                                 OF COUNSEL:

STEVE L. WILLIAMSON, 98-A-0453
Plaintiff, *Pro Se*
Shawangunk Correctional Facility, Box 700
Wallkill, NY 12589

HON. ELIOT L. SPITZER                        KELLY L. MUNKWITZ, ESQ.
New York State Attorney General              Assistant Attorney General
The Capitol
Albany, NY 12224

GEORGE H. LOWE, U.S. MAGISTRATE JUDGE

## REPORT-RECOMMENDATION

        This matter has been referred to me for Report and Recommendation by the Honorable

Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule

N.D.N.Y. 72.3(c).  In this *pro se* civil rights complaint brought under 42 U.S.C. § 1983, Inmate

Steve L. Williamson alleges that five employees of the New York State Department of

Correctional Services were deliberately indifferent to his serious medical needs.  Currently before

the Court is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56.  (Dkt. No.

50.)  For the reasons discussed below, I recommend that Defendants' motion be granted.

**Table of Contents**

I.      BACKGROUND................................................................................................3
II.     SUMMARY JUDGMENT STANDARD.................................................................5
III.    STATEMENT OF MATERIAL FACTS................................................................8
        A.      Background on Plaintiff's Knee Injury..............................................11
        B.      Referral of Plaintiff to an Orthopedic Specialist Regarding His Knee Injury.............13
        C.      Alleged Failure to Provide Plaintiff with an MRI Regarding His Knee Injury...........16
        D.      Alleged Failure to Refer Plaintiff to an Orthopedic Specialist Regarding His
                Ankle Injury..............................................................................18
        E.      Alleged Failure to Answer Plaintiff's Medical Emergency Call Regarding His
                Ankle Injury..............................................................................21
        F.      Alleged Failure to Renew Plaintiff's Permit for Crutches........................22
        G.      Restraint of Plaintiff in Leg Shackles During Visit to Orthopedic Specialist on
                March 11, 2002............................................................................25
        H.      Consequences of Plaintiff's Not Receiving an Arthrogram or for any Delay
                Between His Initial Orthopedic Consultation and His Surgery................30
IV.     ANALYSIS.................................................................................................33
        A.      Plaintiff's "First Claim" (for Failing to Answer Emergency Medical Call)..............33
        B.      Plaintiff's "Second Claim" (for Refusing to Renew Permit for Crutches)...............36
                1.      Failure to Establish Claim....................................................37
                2.      Failure to Exhaust Administrative Remedies.................................38
        C.      Plaintiff's "Third Claim" (for Being Restrained in Leg Shackles)...........................39
                1       Failure to Establish Claim....................................................40
                2.      Defendant Connolly's Qualified Immunity....................................41
        D.      Plaintiff's "Fourth Claim" (for Delaying Examination of Plaintiff, Failing to Provide
                MRI, and Failing to Make Referrals to Specialist)....................................43
        E.      Whether Plaintiff's Claims Against Defendants Goord and Portuondo Should Be
                Dismissed for Failure to Establish Their Personal Involvement................................45

## I.      BACKGROUND

Generally, Plaintiff alleges that five employees of the New York State Department of Correctional Services ("DOCS") violated his rights under the Eighth Amendment by being deliberately indifferent to his degenerative knee condition and sprained ankle while he was incarcerated at Shawangunk Correctional Facility ("Shawangunk C.F.")  Specifically, Plaintiff's Complaint set forth the following **four** claims:

**First Claim:** That DOCS Commissioner **Glenn S. Goord,** Shawangunk C.F. Superintendent **Leonard A. Portuondo,** and Shawangunk C.F. Nurse **Celeste R. Cornelia** violated Plaintiff's rights under the **Eighth Amendment** by depriving Plaintiff of adequate medical attention on **February 1, 2002,** when **Cornelia** did not answer Plaintiff's emergency medical call, despite knowing of Plaintiff's claims of dizziness and vomiting caused by medication, and severe ankle pain (or when **Goord** and **Portuondo** knowingly permitted that deprivation to happen);

**Second Claim:** That DOCS Commissioner **Glenn S. Goord,** Shawangunk C.F. Superintendent **Leonard A. Portuondo,** and Shawangunk C.F. Nurse **Celeste R. Cornelia** violated Plaintiff's rights under the **Eighth Amendment** by depriving Plaintiff of adequate medical attention on **February 18, 2002**, when **Cornelia** refused to renew Plaintiff's permit for crutches (or when **Goord** and **Portuondo** knowingly permitted that deprivation to happen);

**Third Claim:** That DOCS Commissioner **Glenn S. Goord,** Shawangunk C.F. Superintendent **Leonard A. Portuondo,** and Shawangunk C.F. Captain **Daniel Connolly** violated Plaintiff's rights under the **Eighth Amendment** by depriving Plaintiff of adequate medical attention on **March 11, 2002**, when **Connolly** ordered officers to keep Plaintiff

restrained in leg shackles during a medical visit, thereby making it impossible for an orthopedic specialist to adequately examine Plaintiff (or when **Goord** and **Portuondo** knowingly permitted that deprivation to happen); and

**Fourth Claim:** That DOCS Commissioner **Glenn S. Goord,** Shawangunk C.F. Superintendent **Leonard A. Portuondo,** Shawangunk C.F. Health Services Director **Anthony Forte, M.D.,** and Shawangunk C.F. Nurse **Celeste R. Cornelia** violated Plaintiff's rights under the **Eighth Amendment** by depriving Plaintiff of adequate medical attention from **January to March of 2002,** when **Forte** and/or **Cornelia** (1) delayed in seeing Plaintiff, (2) failed to provide an MRI for Plaintiff, and (3) failed to refer Plaintiff to an orthopedic specialist in connection with injuries to Plaintiff's left knee and left ankle (or when **Goord** and **Portuondo** knowingly permitted those deprivations to happen).  (Dkt. No. 1.)

Generally, Defendants' motion for summary judgment (Dkt. No. 50), which Plaintiff has opposed (Dkt. No. 59), raises **five** issues:

**(1)** Whether Plaintiff's "First Claim" as described above (i.e. his claim against Defendants Goord, Portuondo, and Cornelia for failing to answer Plaintiff's emergency medical call on February 1, 2002) should be dismissed because of Plaintiff's failure to establish a deliberate indifference to a serious medical need under the Eighth Amendment;

**(2)** Whether Plaintiff's "Second Claim" as described above (i.e. his claim against Defendants Goord, Portuondo, and Cornelia for refusing to renew Plaintiff's permit for crutches on February 18, 2002) should be dismissed because of Plaintiff's failure to establish a deliberate indifference to a serious medical need under the Eighth Amendment and/or because of Plaintiff's failure to exhaust administrative remedies;

4

**(3)** Whether Plaintiff's "Third Claim" as described above (i.e., his claim against Defendants Goord, Portuondo, and Connolly for restraining Plaintiff in leg shackles during a medical visit on March 11, 2002) should be dismissed because of Plaintiff's failure to establish a deliberate indifference to a serious medical need under the Eighth Amendment and/or because of Defendant Connolly's qualified immunity; and

**(4)** Whether Plaintiff's "Fourth Claim" as described above (i.e. his claim against Defendants Goord, Portuondo, Forte, and Cornelia for delaying in seeing Plaintiff, failing to order an MRI, and failing to refer Plaintiff to an orthopedic specialist from January to March of 2002) should be dismissed because of Plaintiff's failure to establish a claim for deliberate indifference to a serious medical need under the Eighth Amendment; and

**(5)** Whether each of Plaintiff's claims against Defendants Goord and Portuondo should be dismissed because of Plaintiff's failure to establish the personal involvement of Defendants Goord or Portuondo in any of the alleged constitutional violations.  (Dkt. No. 51.)

For the reasons discussed below, I conclude that each of the above questions is answered in the affirmative.  As a result, I recommend that Defendants' motion for summary judgement be granted.

## II.    SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(c), summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In determining whether a

genuine issue of material[1] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citation omitted); *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citation omitted).

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).  The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 477 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Ross v. McGinnis*, 00 Civ. 0275, 2004 WL 1125177, *8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court must view a *pro se* plaintiff's pleadings.  "[I]n actions in which one of the parties appears *pro se,* this Court is faced with the . . . responsibility of granting significant liberality in how *pro se* pleadings are construed."  *Aziz Zarif Shabazz v. Pico*, 994 F.Supp. 460, 467 (S.D.N.Y. 1998); *see Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) (*per curiam* ) (*pro se* pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *Ortiz v.*

---

[1]      A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

*Cornetta,* 867 F.2d 146, 148 (2d Cir. 1989).  For example, where a plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir. 2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F. Supp. 794, 799 (W.D.N.Y. 1997) (motion for summary judgment in civil rights case).

However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, . . . [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.*, No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994).  In other words,  "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment." *Bussa v. Aitalia Line Aeree Italiane S.p.A.*, 02-CV-10296, 2004 WL 1637014, at *4 (S.D.N.Y. July 21, 2004) (citations omitted), *accord*, *Durran v. Selsky*, 251 F. Supp.2d 1208, 1211 (W.D.N.Y. 2003) (citations omitted).

## III.   STATEMENT OF MATERIAL FACTS

The facts set forth in a defendant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record[2] and are not specifically controverted by the plaintiff.[3]

To "specifically controvert[]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and* that "set[s] forth a specific citation to the record where the factual issue arises."[4]

---

[2]      *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citations omitted).

[3]      *See* Local Rule 7.1(a)(3) ("Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.").

[4]      Local Rule 7.1(a)(3); *see, e.g.*, *Jones v. Smithkline Beecham Corp.*, 309 F. Supp.2d 343, 346 (N.D.N.Y. 2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso*, 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact.  Nor has he overcome his failure to respond to Defendants' Rule 7.1(a)(3) Statement.  Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v. Niles*, 250 F. Supp.2d 63, 67 (N.D.N.Y. 2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record.  Because plaintiff's response Rule 7.1(a)(3) statement does not comply with the local rules, it has not been considered."); *Mehlenbacher v. Slafrad*, 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at *4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendants' statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement . . . are accepted as true."); *Adams v. N.Y. State Thruway Auth.*, 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at *2, n.1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 7.1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff.").

Portions of the record sufficient to create a "factual issue" include affidavits or a verified complaint.[5]  However, such an affidavit or verified complaint must, among other things, be based "on personal knowledge."[6]  An affidavit or verified complaint is not based on personal knowledge if, for example, it is based on mere suspicion, rumor, hearsay, or secondhand information.[7]  Similarly, such an affidavit or verified complaint must not be general and conclusory.[8]

Here, in addition to filing a memorandum of law, Plaintiff has filed only affirmations in opposition to each of the four affirmations filed by Defendants in support of their motion for

---

[5]     *See Patterson v. County of Oneida*, 375 F.2d 206, 219 (2d. Cir. 2004) ("[A] verified pleading . . . has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied*, 536 U.S. 922 (2002); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") (citations omitted); Fed. R. Civ. P. 56(c) ("The judgment sought shall be rendered forthwith if the . . . affidavits . . . show that there is no genuine issue as to any material fact . . . .").

[6]     Fed. R. Civ. P. 56(e) (requiring "personal knowledge"); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.*, 44 F.3d 1082, 1084 (2d Cir. 1995) (citations omitted), *cert. denied sub nom*, *Ferrante v. U.S.*, 516 U.S. 806 (1995).

[7]     *Applegate v. Top Assoc., Inc.*, 425 F.2d 92, 97 (2d Cir. 1970) (rejecting affidavit made on "suspicion . . . rumor and hearsay"); *Spence v. Maryland Cas. Co.*, 803 F. Supp. 649, 664 (W.D.N.Y. 1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd*, 995 F. 2d 1147 (2d Cir. 1993).

[8]     *See Patterson v. County of Oneida*, 375 F.2d 206, 219 (2d. Cir. 2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") (citations omitted); *West-Fair Elec. Contractors v. Aetna Cas. & Sur.*, 78 F.3d 61, 63 (2d Cir. 1996) (rejecting "conclusory" statements in opposing affidavit); *Applegate*, 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings"); Fed. R. Civ. P. 56(e) (requiring more than "mere allegations or denials of . . . [a pleading] . . . but . . . specific facts showing that there is a genuine issue for trial").

summary judgment.  (Dkt. No. 59, Part 1 [Plf.'s Opp. Affirmations].)  These affirmations do not

comprise the "response to the Statement of Material Facts" that is required by Local Rule 7.1.

*Compare* N.D.N.Y. L.R. 7.1(a)(2) (describing "affidavits") *with* N.D.N.Y. L.R. 7.1(a)(2)

(describing "response to the Statement of Material Facts," which must be supported by evidence

such as affidavits).  The same is true with respect to Plaintiff's Verified Complaint, which (as

mentioned above) has the effect of an affidavit.

The Court has no duty to assiduously search the record for evidence creating a dispute of

material fact, where a plaintiff has failed to file a response to a Statement of Material Facts.[9]

However, even if the Court were to treat Plaintiff's four affidavits (and Verified Complaint) as

comprising a "response" under Local Rule 7.1(a)(3), the Court would find that, overwhelmingly,

Plaintiff has failed to specifically controvert the facts set forth in the Defendants' Rule 7.1

Statement.  This is because Plaintiff's affidavits often (1) assert facts that are non-responsive to

Defendants' Rule 7.1 Statement and/or simply immaterial to Defendants' motion, (2) fail to deny

Defendants' factual assertions, and/or (3) fail to support Plaintiff's denials with citations to (non-

conclusory) evidence in the record.  (Dkt. No. 59, Part 1 [Plf.'s Responses to Defs.' Affidavits].)

---

[9]     N.D.N.Y. L.R. 7.1(a)(3); *Smithkline Beecham*, 309 F. Supp.2d at 346 ("The Local
Rules require the litigant, not the Court, to sift through the record and bring to the Court's
attention the pertinent information."); *see also Amnesty America v. Town of West Hartford*, 288
F.3d 467, 470 (2d Cir. 2002) ("We agree with those circuits that have held that Fed. R. Civ. P. 56
does not impose an obligation on a district court to perform an independent review of the record
to find proof of a factual dispute.") (citations omitted); *Monahan v. N.Y. City Dep't of
Corrections*, 214 F.3d 275, 291 (2d Cir. 2000) (noting that the local rules are "designed to place
the responsibility on the parties to clarify the elements of the substantive law which remain at
issue because they turn on contested facts . . . . While the trial court has discretion to conduct an
assiduous review of the record in an effort to weigh the propriety of granting a summary
judgment motion, it is not required to consider what the parties fail to point out.") (internal
quotations and citations omitted).

The following material facts, even when viewed most favorably to Plaintiff, are supported by evidence in the record, and not specifically controverted by Plaintiff:

**Background on Plaintiff's Knee Injury**

1.     In 1986, Plaintiff injured his left knee in an automobile accident.[10]  Over the following years, this injury helped contribute to the onset of chronic pain and instability in Plaintiff's left knee.[11]

2.     For example, in March of 1998, while an inmate at Attica Correctional Facility ("Attica C.F."), Plaintiff was diagnosed with arthrosis in his left knee.[12]  Arthrosis is a chronic, degenerative condition that may cause inflammation and pain.[13]

3.     At approximately this time, Plaintiff began being treated with Indocin for his arthrosis.[14]  Indocin is a non-steroidal, anti-inflammatory drug used to alleviate the pain,

---

[10]     (Dkt. No. 53, ¶ 4 [Rubinovich Aff.]; Dkt. No. 56, ¶ 8 [Forte Aff.]; Dkt. No. 56 at 44, 73, 177 [Ex. A to Forte Aff.].)

[11]     (Dkt. No. 53, ¶¶ 3-4 [Rubinovich Aff.]; Dkt. No. 56, ¶ 8 [Forte Aff.]; Dkt. No. 56 at 44, 73, 177 [Ex. A to Forte Aff.]; Dkt. No. 1, Attach. at 1 [Plf.'s Verified Compl.]; *see also* Dkt. No. 59, Part 1, ¶ 8 [Plf.'s Response to Forte Aff., not citing any evidence in denying this fact]; Dkt. No. 59, Part 1, ¶ 4 [Plf.'s Response to Rubinovich Aff., not citing any evidence in denying this fact].)

[12]     (Dkt. No. 56, ¶ 10 [Forte Aff.]; Dkt. No. 56 at 65, 194, 197, 204, 218 [Ex. A. to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 10 [Plf.'s Response to Forte Aff., admitting this fact]; *see also* Dkt. No. 1, Attach. at 1 [Plf.'s Verified Compl.].)

[13]     (Dkt. No. 56, ¶ 10 [Forte Aff.]; Dkt. No. 56 at 65, 194, 197, 204, 218 [Ex. A. to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 10 [Plf.'s Response to Forte Aff., admitting this fact].)

[14]     (Dkt. No. 56, ¶ 10 [Forte Aff.]; Dkt. No. 59, Part 1, ¶ 10 [Plf.'s Response to Forte Aff., admitting this fact]; *see also* Dkt. No. 1, Attach. at 1 [Plf.'s Verified Compl.].)

11

swelling, inflammation and stiffness often associated with degenerative joint disease.[15] Notwithstanding the Indocin, Plaintiff continued to complain of pain in his left knee, particularly after running or playing basketball.[16]

      4.      On or about May 21, 2001, Plaintiff fell and injured his left knee while playing basketball at Attica C.F..[17]  He was examined by an Attica C.F. medical care provider.  (Dkt. No. 56 at 48 [Ex. A to Forte Aff.].)

      5.      On or about May 22, 2001, Plaintiff was taken to an emergency room for treatment of the injury he sustained the day before.[18]

      6.      Between May 22, 2001, and July 24, 2001, Plaintiff continued to play basketball.[19]

      7.      On July 24, 2001, Plaintiff complained of knee pain and swelling to an Attica C.F.

---

[15]      (Dkt. No. 56, ¶ 10 [Forte Aff.]; Dkt. No. 59, Part 1, ¶ 10 [Plf.'s Response to Forte Aff., admitting this fact].)

[16]      (Dkt. No. 56, ¶ 11 [Forte Aff.]; Dkt. No. 56 at 42 [Ex. A. to Forte Aff.]; *see also* Dkt. No. 59, Part 1, ¶ 11 [Plf.'s Response to Forte Aff., not citing any evidence in denying this fact].)

[17]      (Dkt. No. 56 at 48 [Ex. A. to Forte Aff.]; Dkt. No. 52, ¶ 17 [Defs.' Rule 7.1 Statement]; Dkt. No. 59, Part 1 [Plf.'s Rule 7.1 Response, not specifically controverting this fact].)

[18]      (Dkt. No. 56 at 48 [Ex. A to Forte Aff.].)

[19]      (Dkt. No. 56 at 46, 48 [Ex. A to Forte Aff.]; Dkt. No. 52, ¶ 18 [Defs.' Rule 7.1 Statement]; Dkt. No. 59, Part 1 [Plf.'s Rule 7.1 Response, not specifically controverting this fact]; Dkt. No. 50 at 17-18 [Ex. A to Munkwitz Aff.]; *cf.* Dkt. No. 52, ¶ 11 [Defs.' Rule 7.1 Statement; Dkt. No. 59, Part 1 [Plf.'s Rule 7.1 Response, not specifically controverting this fact].)

medical care provider.[20]  After a medical examination, Plaintiff was advised to play less

basketball.[21]

8.      It is the medical opinion of Defendant Rubinovich that the wear and tear on

Plaintiff's knee from basketball most likely helped contribute to the degeneration of Plaintiff's

knee (which had first been injured in 1986).[22]

### Referral of Plaintiff to an Orthopedic Specialist
### Regarding His Knee Injury

9.      On or about September 10, 2001, Plaintiff was transferred from Attica C.F. to

Shawangunk C.F.[23]

10.     On or about September 19, 2001, Plaintiff complained of left knee pain to a

Shawangunk C.F. medical care provider.[24]  Plaintiff was examined by Defendant Forte.[25]  As a

result of this medical examination, Plaintiff continued to receive Indocin for the pain and

---

[20]      (Dkt. No. 56 at 46 [Ex. A to Forte Aff.]; Dkt. No. 52, ¶ 18 [Defs.' Rule 7.1 Statement]; Dkt. No. 59, Part 1 [Plf.'s Rule 7.1 Response, not specifically controverting this fact]; Dkt. No. 1, Attach. at 1 [Plf.'s Verified Compl.].)

[21]      (Dkt. No. 56 at 46 [Ex. A to Forte Aff.]; Dkt. No. 52, ¶ 18 [Defs.' Rule 7.1 Statement]; Dkt. No. 59, Part 1 [Plf.'s Rule 7.1 Response, not specifically controverting this fact].)

[22]      (Dkt. No. 53, ¶ 8 [Rubinovich Aff.]; Dkt. No. 59, Part 1, ¶ 8 [Plf.'s Response to Rubinovich Aff., not citing any evidence contradicting this fact].)

[23]      (Dkt. No. 56, ¶ 8 [Forte Aff.]; Dkt. No. 59, Part 1, ¶ 8 [Plf.'s Response to Forte Aff., not specifically controverting this fact]; Dkt. No. 1, Attach. at 1 [Plf.'s Verified Compl.].)

[24]      (Dkt. No. 56, ¶ 8 [Forte Aff.]; Dkt. No. 59, Part 1, ¶ 8 [Plf.'s Response to Forge Aff., not specifically controverting this fact]; Dkt. No. 50 at 9 [Ex. A to Munkwitz Aff.]; Dkt. No. 1 at 1 [Plf.'s Verified Compl.].)

[25]      (Dkt. No. 56 at 44 [Ex. A to Forte Aff.].)

swelling of his left knee.[26]  In addition, Plaintiff continued to use a "knee sleeve," which had

been given to him at Attica C.F.[27]

      11.    Based on Defendant Forte's examination of Plaintiff on September 19, 2001, it

appeared to Defendant Forte that Plaintiff's complaints about his left knee occurred most

frequently after he had run or played basketball.[28]

      12.    Due to Plaintiff's continued complaints of pain in his left knee, on October 5,

2001, Defendant Forte submitted a request to have Plaintiff's knees examined by x-ray.[29]

      13.    On October 5, 2001, Plaintiff's knees were examined by x-ray.[30]

      14.    After receiving the results of Plaintiff's x-ray examinations, Defendant Forte

reviewed those results.[31]  The x-ray examinations revealed to Defendant Forte that Plaintiff had

(1) mild degenerative joint disease in his right knee and (2) progressive moderate degenerative

---

[26]    (Dkt. No. 56, ¶ 10 [Forte Aff.]; Dkt. No. 56 at 43-44 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 10 [Plf.'s Response to Forte Aff., admitting this fact]; Dkt. No. 50 at 11 [Ex. A to Munkwitz Aff.].)

[27]    (Dkt. No. 50 at 11-12 [Ex. A to Munkwitz Aff.].)

[28]    (Dkt. No. 56, ¶ 11 [Forte Aff.]; Dkt. No. 56 at 42 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 11 [Plf.'s Response to Forte Aff., not specifically controverting this fact].)

[29]    (Dkt. No. 56, ¶ 11 [Forte Aff.]; Dkt. No. 56 at 42 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 11 [Plf.'s Response to Forte Aff., not specifically controverting this fact].)

[30]    (Dkt. No. 56 at 41-42 [Ex. A to Forte Aff.]; Dkt. No. 2 [Ex. B to Plf.'s Verified Compl.].)

[31]    (Dkt. No. 56 at 41 [Ex. A to Forte Aff.].)

joint disease in his left knee.[32]  This was consistent with Plaintiff's 1998 diagnosis of arthrosis.[33]

15.    On October 30, 2001, in response to Plaintiff's continued complaints of pain in his left knee, Defendant Forte (1) ordered a knee brace for Plaintiff (to be given to Plaintiff when it became available), and (2) replaced Plaintiff's prescription for Indocin with a prescription for Feldene.[34]  Feldene is a non-steroidal, anti-inflammatory drug used to alleviate the pain, swelling, inflammation, and stiffness associated with degenerative joint disease.[35]

16.    At some point between September 10, 2001, and December 4, 2001, Plaintiff came to disagree with Defendant Forte's diagnosis and treatment.[36]

17.    On December 4, 2001, Plaintiff filed a grievance requesting to be seen by an orthopedic specialist.[37]  Plaintiff did not want to be seen by Defendant Forte because Defendant Forte was not an orthopedic specialist.[38]

---

[32]    (Dkt. No. 56, ¶ 11 [Forte Aff.]; Dkt. No. 59 at 179 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 11 [Plf.'s Response to Forte Aff., not citing any evidence in denying this fact].)

[33]    (Dkt. No. 56, ¶ 11 [Forte Aff.]; Dkt. No. 59, Part 1, ¶ 11 [Plf.'s Response to Forte Aff., not citing any evidence contradicting this sworn medical opinion].)

[34]    (Dkt. No. 56, ¶ 12 [Forte Aff.]; Dkt. No. 56 at 41 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 12 [Plf.'s Response to Forte Aff., not specifically controverting this fact].)

[35]    (Dkt. No. 56, ¶ 12 [Forte Aff.]; Dkt. No. 59, Part 1, ¶ 12 [Plf.'s Response to Forte Aff., not specifically controverting this fact].)

[36]    (Dkt. No. 50 at 14-15 [Ex. A to Munkwitz Aff.].)

[37]    (Dkt. No. 50 at 14 [Ex. A to Munkwitz Aff.]; Dkt. No. 2 [Ex. C to Plf.'s Verified Compl.].)

[38]    (Dkt. No. 50 at 14-15 [Ex. A to Munkwitz Aff.]; Dkt. No. 2 [Ex. C to Plf.'s Verified Compl.].)

18.     However, on November 30, 2001, Defendant Forte had already recommended that Plaintiff be seen by an orthopedic specialist.[39]

19.     As a result, on December 19, 2001, Plaintiff was seen by an orthopedic specialist, Dr. Maxwell Alley, M.D.[40]  Dr. Alley recommended that Plaintiff receive either a magnetic resonance imaging examination ("MRI") or an anthrogram.[41]  Plaintiff has acknowledged that this examination satisfied the complaint he made in his December 4, 2001, grievance.[42]

### Alleged Failure to Provide Plaintiff with an MRI
### Regarding His Knee Injury

20.     On December 26, 2001, based on Dr. Alley's recommendation, Defendant Forte submitted a request for an MRI of Plaintiff.[43]   (Defendant Forte does not have discretion to simply refer inmates to outside entities for special services without permission.[44])

21.     However, on January 16, 2002, Dr. Alley advised Defendant Forte that an MRI was not possible because Plaintiff had dental bridgework (whose metal components apparently

---

[39]     (Dkt. No. 56, ¶ 13 [Forte Aff.]; Dkt. No. 56 at 40, 177 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 13 [Plf.'s Response to Forte Aff., admitting this fact].)

[40]     (Dkt No. 56, ¶ 14 [Forte Aff.]; Dkt. No. 59, Part 1, ¶ 14 [Plf.'s Response to Forte Aff., not specifically controverting this fact]; Dkt. No. 50 at 15 [Ex. A to Munkwitz Aff.].)

[41]     (Dkt No. 56, ¶ 14 [Forte Aff.]; Dkt. No. 59, Part 1, ¶ 14 [Plf.'s Response to Forte Aff., not specifically controverting this fact]; Dkt. No. 53, ¶ 10 [Rubinovich Aff.]; Dkt. No. 50 at 15-16 [Ex. A to Munkwitz Aff.].)

[42]     (Dkt. No. 50 at 15-16 [Ex. A to Munkwitz Aff.].)

[43]     (Dkt. No. 56, ¶ 15 [Forte Aff.]; Dkt. No. 56 at 175 [Ex. A to Forte Aff.].)

[44]     (Dkt. No. 56, ¶ 13 [Forte Aff.]; Dkt. No. 59, Part 1, ¶ 13 [Plf.'s Response to Forte Aff., admitting this fact].)

16

may interfere with the MRI).[45]  Dr. Alley, therefore, recommended an arthrogram.[46]

22.    On January 18, 2002, Defendant Forte submitted a request for Plaintiff to receive an arthrogram.[47]

23.    Between January 18, 2002, and March 11, 2002, Plaintiff was scheduled for three orthopedic appointments, which were cancelled for reasons beyond Defendants' control.[48]  (In early 2002, getting appointments for inmates was difficult because DOCS was having trouble retaining orthopedic specialists who were willing to provide services for inmates.[49])

---

[45]    (Dkt. No. 56, ¶ 15 [Forte Aff.]; Dkt. No. 56 at 173 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 15 [Plf.'s Response to Forte Aff., not citing any evidence contradicting this fact].)  I note that it appears that subsequently (on December 10, 2002) an MRI examination was in fact taken of Plaintiff (i.e., of his left ankle).  (Dkt. No. 56 at 13 [Ex. A to Forte Aff.].)  Of course, this fact does not contradict the fact asserted above, since Dr. Alley could have been mistaken, or the MRI in question could have been taken in error.

[46]    (Dkt. No. 56, ¶ 15 [Forte Aff.]; Dkt. No. 56 at 173 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 15 [Plf.'s Response to Forte Aff., not specifically controverting this fact].)

[47]    (Dkt. No. 56, ¶ 16 [Forte Aff.]; Dkt. No. 56 at 172 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 16 [Plf.'s Response to Forte Aff., not specifically controverting this fact].)

[48]    (Dkt. No. 56, ¶ 17 [Forte Aff.]; Dkt. No. 50 at 16-17 [Ex. A to Munkwitz Aff.]; Dkt. No. 59, Part 1, ¶ 17 [Plf.'s Response to Forte Aff., not specifically controverting this fact].)

[49]    (Dkt. No. 56, ¶ 16 [Forte Aff.]; Dkt. No. 59, Part 1, ¶ 16 [Plf.'s Response to Forte Aff., not citing any evidence contradicting this fact].)

### Alleged Failure to Refer Plaintiff to an Orthopedic Specialist
### Regarding His Ankle Injury

24.    Meanwhile, on January 7, 2002, Plaintiff injured his left ankle playing

basketball.[50]  (At his deposition, Plaintiff testified that, until January 7, 2002, he was still playing

basketball at least twice a week.[51])  That evening, Plaintiff was seen by the medical department at

Shawangunk C.F.[52]  Plaintiff was provided ice and an Ace bandage.[53]  In addition, he was

provided a no-duty pass for the dates January 8, 2002, to January 13, 2002.[54]

25.    On January 14, 2002, Plaintiff sought further medical treatment for his ankle

---

[50]    (Dkt. No. 56, ¶ 26 [Forte Aff.]; Dkt. No. 56 at 37, 39 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 26 [Plf.'s Response to Forte Aff., not specifically controverting this fact]; Dkt. No. 50 at 18-19 [Ex. A to Munkwitz Aff.]; Dkt. No. 53, ¶ 12 [Rubinovich Aff.]; Dkt. No. 59, Part 1, ¶ 12 [Plf.'s Response to Rubinovich Aff., not specifically controverting this fact]; Dkt. No. 55, ¶ 4 [Cornelia Aff.]; Dkt. No. 59, Part 1, ¶ 4 [Plf.'s Response to Cornelia Aff., admitting this fact].)

[51]    (Dkt. No. 50 at 17-18 [Ex. A to Munkwitz Aff.].)

[52]    (Dkt. No. 56, ¶ 26 [Forte Aff.]; Dkt. No. 56 at 39 [Ex. A to Forte Aff.]; Dkt. No. 50 at 20-21 [Ex. A to Munkwitz Aff.]; Dkt. No. 59, Part 1, ¶ 26 [Plf.'s Response to Rubinovich Aff., not specifically controverting this fact].)

[53]    (Dkt. No. 56, ¶ 26 [Forte Aff.]; Dkt. No. 56 at 39 [Ex. A to Forte Aff.]; Dkt. No. 50 at 20-21 [Ex. A to Munkwitz Aff.]; Dkt. No. 59, Part 1, ¶ 26 [Plf.'s Response to Forte Aff., admitting this fact].)

[54]    (Dkt. No. 56, ¶ 26 [Forte Aff.]; Dkt. No. 50 at 20-21 [Ex. A to Munkwitz Aff.]; Dkt. No. 59, Part 1, ¶ 26 [Plf.'s Response to Forte Aff., citing no evidence contradicting this fact].)

injury.[55]   An appointment was scheduled with Defendant Forte for January 18, 2002.[56]

26.     On January 18, 2002, Dr. Forte (1) examined Plaintiff, (2) referred Plaintiff for x-ray examinations to rule out a fracture, (3) prescribed another no-duty pass for Plaintiff, this one for a one-month period, and (4) prescribed Naprosym for Plaintiff for the treatment of pain and swelling.[57]

27.     On January 23, 2002, Plaintiff filed a grievance requesting to be seen by a specialist to determine the extent of his ankle injury.[58]

28.     On January 30, 2002, Superintendent Portuondo responded to Plaintiff's grievance, stating, "Grievance is accepted to the extent that the grievant will be seen by an orthopedic specialist at the proper time."[59]

29.     Between January 7, 2002 (the date of Plaintiff's initial injury), and February 1, 2002, Plaintiff was seen by the Shawangunk C.F. medical department with respect to his ankle

---

[55]     (Dkt. No. 56, ¶ 27 [Forte Aff.]; Dkt. No. 50 at 37-39 [Ex. A to Munkwitz Aff.]; Dkt. No. 59, Part 1, ¶ 27 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

[56]     (Dkt. No. 56, ¶ 27 [Forte Aff.]; Dkt. No. 50 at 37-39 [Ex. A to Munkwitz Aff.]; Dkt. No. 59, Part 1, ¶ 27 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

[57]     (Dkt. No. 56 at 37 [Ex. A to Forte Aff.]; Dkt. No. 50 at 25-27 [Ex. A to Munkwitz Aff.].)

[58]     (Dkt. No. 1 at 2 [Plf.'s Verified Compl.]; Dkt. No. 2 [Ex. E to Plf.'s Verified Compl.].)

[59]     (Dkt. No. 2 [Ex. E to Plf.'s Verified Compl.].)

injury on at least four occasions.[60]

30.     At some point, Plaintiff was scheduled for a follow-up appointment with Defendant Forte to be held on February 8, 2002.[61]

31.     On February 8, 2002, Plaintiff was examined by Defendant Forte.[62]  Defendant Forte continued Plaintiff's Naprosym prescription and recommended that Plaintiff be seen by an orthopedic specialist.[63]

32.     On March 20, 2002, and on April 23, 2002, Plaintiff's ankle was examined by one or more orthopedic specialists, who diagnosed Plaintiff with a left ankle sprain.[64]

---

[60]     (Dkt. No. 55, ¶ 4 [Cornelia Aff.]; Dkt. No. 59, Part 1, ¶ 4 [Plf.'s Response to Cornelia Aff., admitting this fact].)

[61]     (Dkt. No. 56, ¶ 29 [Forte Aff.]; Dkt. No. 59, Part 1, ¶ 29 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact]; Dkt. No. 55, ¶ 5 [Cornelia Aff.]; Dkt. No. 59, Part 1, ¶ 5 [Plf.'s Response to Cornelia Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

[62]     (Dkt. No. 56, ¶ 29 [Forte Aff.]; Dkt. No. 56 at 36 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 29 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

[63]     (Dkt. No. 56, ¶ 29 [Forte Aff.]; Dkt. No. 50 at 32 [Ex. A to Munkwitz Aff.]; Dkt. No. 59, Part 1, ¶ 29 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

[64]     (Dkt. No. 56, ¶ 31 [Forte Aff.]; Dkt. No. 56 at 169, 172 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 31 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact]; Dkt. No. 53, ¶ 12 [Rubinovich Aff.]; Dkt. No. 59, Part 1, ¶ 12 [Plf.'s Response to Rubinovich Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

**Alleged Failure to Answer Plaintiff's Medical Emergency Call**
**Regarding His Ankle Injury**

33.     Meanwhile, on February 1, 2002, Plaintiff apparently experienced simultaneous

(1) pain in his left knee and left ankle and (2) nauseousness and dizziness that he claims resulted

from an adverse interaction between two of his prescribed medications.[65]  As a result, Plaintiff

made an emergency medical call  to Corrections Officer Horton ("C.O. Horton").[66]  At the time

of this emergency medical call, Defendant Cornelia was not advised by C.O. Horton (or anyone)

that Plaintiff's medical emergency call was based on nausea and dizziness due to his

medications.[67]

34.     Defendant Cornelia declined to see Plaintiff on February 1, 2002, because she

believed that she was unable to provide additional medical treatment for Plaintiff.[68]  Specifically,

prior to February 1, 2002, Plaintiff had been treated for the ankle injury, was receiving

medication for the ankle injury, and was scheduled for a follow-up appointment with Defendant

---

[65]     (Dkt. No. 50 at 72-74 [Ex. A to Munkwitz Aff.]; Dkt. No. 1, Attach. at 2 [Plf.'s Verified Compl.]; Dkt. No. 59, Part 1, ¶ 3 [Plf.'s Response to Cornelia Aff.].)

[66]     (Dkt. No. 55, ¶ 3 [Cornelia Aff.]; Dkt. No. 59, Part 1, ¶ 3 [Plf.'s Response to Cornelia Aff.]; Dkt. No. 50 at 72-74 [Ex. A to Munkwitz Aff.]; Dkt. No. 1, Attach. at 2 [Plf.'s Verified Compl.]; Dkt. No. 2 [Ex. D to Plf.'s Verified Compl.].)

[67]     (Dkt. No. 55, ¶ 8 [Cornelia Aff.]; Dkt. No. 59, Part 1, ¶ 8 [Plf.'s Response to Cornelia Aff., not specifically controverting this fact and not citing any evidence contradicting this fact]; Dkt. No. 50 at 74 [Ex. A to Munkwitz Aff., attaching Plaintiff's deposition testimony, in which Plaintiff admits that he has no knowledge of this fact].)

[68]     (Dkt. No. 55, ¶ 7 [Cornelia Aff.]; Dkt. No. 59, Part 1, ¶ 7 [Plf.'s Response to Cornelia Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

Forte.[69]  That follow-up appointment occurred on February 8, 2002 (referenced above).[70]

### Alleged Failure to Renew Plaintiff's Permit for Crutches

35.    On January 18, 2002, Dr. Forte prescribed crutches for Plaintiff for a certain period of time.[71]

36.    Defendants have introduced evidence that this period of time was for one month, while Plaintiff has introduced evidence that this period of time was for two months.[72] (Apparently, Dr. Forte instructed Plaintiff to use crutches for a two-month period, but issued Plaintiff a permit to use crutches for only a one-month period.)[73]  In any event, I find that this dispute of fact is not material to Defendants' motion, for reasons discussed below in the Analysis

---

[69]    (Dkt. No. 55, ¶ 7 [Cornelia Aff.]; Dkt. No. 59, Part 1, ¶ 7 [Plf.'s Response to Cornelia Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

[70]    (Dkt. No. 56, ¶ 29 [Forte Aff.]; Dkt. No. 56 at 36 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 29 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

[71]    (Dkt. No. 56, ¶ 28 [Forte Aff.]; Dkt. No. 50 at 25-27 [Ex. A to Munkwitz Aff.] Dkt. No. 56 at 37 [Ex. A to Forte Aff.]; Dkt. No. 2 [Exs. H and I to Plf.'s Verified Compl.]; Dkt. No. 59, Part 1, ¶ 28 [Plf.'s Response to Forte Aff., admitting this fact].)

[72]    (*See* Dkt. No. 56, ¶ 28 [Forte Aff.] [sworn statement that Dr. Forte "prescribed plaintiff crutches for month"]; Dkt. No. 56 at 37 [Ex. A to Forte Aff.] ["Ambulatory Health Record" signed by Dr. Forte and dated 1/18/02, indicating that the crutches were "ordered" and "permitted" for "1 mo."]; Dkt. No. 2 [Ex. I to Plf.'s Verified Compl.] ["Medical Equipment Pass" signed by Dr. Forte and dated 1/18/02, stating that Plaintiff was "issued" crutches on 1/18/02, with an "expiration date" of 2/18/02; *but see* Dkt. No. 59, Part 2 at ¶ 4 [Ex. 6 to Plf.'s Mem. of Law] [Defs.' Response to Plf.'s Request for Admissions, admitting that "Dr. Forte ordered plaintiff to use crutches for two months."]; Dkt. No. 59, Part 2 [Ex. 2 to Plf.'s Mem. of Law] ["Medical No-Duty Status" document signed by Dr. Forte and dated 1/18/02, containing "special instructions from M.D." that Plaintiff shall "use crutches for 2 mo."].)

[73]    (*Id.*)

section of this Report-Recommendation: in short, even if Plaintiff is correct that Dr. Forte

prescribed crutches for Plaintiff for a two-month period of time, that fact would not confer

liability on Defendants Cornelia, Goord, and Portuondo for their alleged failure to renew

Plaintiff's permit for crutches on or about February 18, 2002.

37.    Prior to February 18, 2002, Plaintiff had never sought a renewal of his crutches

permit.[74]

38.    On February 18, 2002, Plaintiff was apparently informed by a corrections officer

that his crutches permit had expired, and he was escorted to the Shawangunk C.F. medical

department to discuss the permit.[75]  At some point during his visit to the medical department,

Plaintiff complained to Defendant Cornelia that he wanted to see a specialist for his knee and

ankle.[76]  Defendant Cornelia explained to Plaintiff that Shawangunk C.F. was making an effort to

refer Plaintiff to a specialist, but that the facility was having difficulty finding a health care

provider.[77]  At the time, orthopedic consults were virtually at a standstill in the absence of a

---

[74]    (Dkt. No. 50 at 43-44 [Ex. A to Munkwitz Aff.]; *cf.* Dkt. No. 52, ¶ 75 [Defs.'
Rule 7.1 Statement, asserting that "Plaintiff did not seek a further No-Duty pass in connection
with his ankle injury" after the expiration of his January 18, 2001, No-Duty pass, which pass
Plaintiff alleges permitted him to use crutches]; Dkt. No. 59 [Plf.'s Rule 7.1 Response, not
specifically controverting this fact].)

[75]    (Dkt. No. 59, Part 1, ¶ 12 [Plf.'s Response to Cornelia Aff.]; Dkt. No. 1, Attach. at
2-3 [Plf.'s Verified Complaint].)

[76]    (Dkt. No. 55, ¶ 12 [Cornelia Aff.]; Dkt. No. 59, Part 1, ¶ 12 [Plf.'s Response to
Cornelia Aff., not specifically denying this fact and not citing contrary evidence].)

[77]    (Dkt. No. 55, ¶ 12 [Cornelia Aff.]; Dkt. No. 59, Part 1, ¶ 12 [Plf.'s Response to
Cornelia Aff., not specifically denying this fact and not citing contrary evidence].)

medical emergency.[78]  Plaintiff was upset at being denied an outside appointment.[79]

39.     As to Plaintiff's permit for crutches, Defendant Cornelia believed that Plaintiff's permit, issued on January 18, 2002, was for a one-month period of time.[80]  She based this belief on her understanding that (1) while Plaintiff's "Medical No-Duty Status" document notes that Plaintiff shall use the crutches for two months, Plaintiff's actual "Medical Equipment Pass" permitted Plaintiff to use the crutches for only one month, and (2) Plaintiff's "Ambulatory Health Record" for January 18, 2002, indicates that Plaintiff was prescribed crutches for only one month.[81]  (The parties dispute whether, despite this belief, Defendant Cornelia offered to renew Plaintiff's crutches permit for another month, and, if so, whether Plaintiff declined that offer.[82]

---

[78]     (Dkt. No. 55, ¶ 12 [Cornelia Aff.]; Dkt. No. 59, Part 1, ¶ 12 [Plf.'s Response to Cornelia Aff., not specifically denying this fact and not citing contrary evidence].)

[79]     (Dkt. No. 55, ¶ 12 [Cornelia Aff.]; Dkt. No. 59, Part 1, ¶ 12 [Plf.'s Response to Cornelia Aff., not specifically denying this fact and not citing contrary evidence].)

[80]     (Dkt. No. 55, ¶ 11 [Cornelia Aff., stating, among other things that, "even though plaintiff was only prescribed the crutches for one month, I offered to renew his permit for another month"].)

[81]     (*See* Dkt. No. 55, ¶ 10 [Cornelia Aff., stating the reasons that she believes that the crutches permit was for one month]; Dkt. No. 59, Part 1, ¶ 10 [Plf.'s Response to Cornelia Aff., not specifically controverting this fact]; Dkt. No. 55, ¶ 11 [Cornelia Aff., stating, "Had I refused to renew plaintiff's crutches after one month, I would have been acting within the scope of the facility medical directors orders"]; Dkt. No. 59, Part 1, ¶ 11 [Plf.'s Response to Cornelia Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)  I note that, because the fact in question has to do with Defendant Cornelia's *belief* about the crutches permit, not whether the permit was indeed for one month, Plaintiff's other assertions (that the permit was for two months) are immaterial to the fact in question.

[82]     (*Compare* Dkt. No. 55, ¶ 11 [Cornelia Aff., testifying "I offered yo renew his permit for another month" but citing no other record evidence] *with* Dkt. No. 59, Part 1, ¶¶ 11-12 [Plf.'s Response to Cornelia Aff., testifying, "At no time did defendant offer[] to renew plaintiff's crutches." but citing no other record evidence].)

However, again, I find this dispute not material to Defendants' motion, for the reasons discussed below in the Analysis section of this Report-Recommendation: in short, even if Plaintiff is correct that Defendant Cornelia did not offer to renew his crutches permit for another month, that fact would not confer liability on Defendants Cornelia, Goord, and Portuondo.)

40.    As of February 18, 2002, Plaintiff was able to perform his daily activities without restriction.[83]

**Restraint of Plaintiff in Leg Shackles
During Visit to Orthopedic Specialist on March 11, 2002**

41.    On March 11, 2002, Plaintiff was scheduled to be seen at the Orthopedic Group in Albany, New York.[84]  Defendant Connolly was responsible for authorizing Plaintiff's transfer to the Orthopedic Group.[85]

42.    Before authorizing the transportation of an inmate, Defendant Connolly considers various factors including (1) the type of crime for which the inmate is incarcerated, (2) the sentence the inmate is serving, (3) the physical size of the inmate, (4) any escape attempts by the inmate, (5) any misbehavior reports concerning the inmate, and (6) any contacts the inmate may

---

[83]    (Dkt. No. 50 at 43-47 [Ex. A to Munkwitz Aff.]; Dkt. No. 52, ¶ 74 [Defs.' Rule 7.1 Statement]; Dkt. No. 59 [Plf.'s Rule 7.1 Response, not specifically controverting this fact].)

[84]    (Dkt. No. 54, ¶ 5 [Connolly Aff.]; Dkt. No. 56, ¶ 18 [Forte Aff.]; Dkt. No. 50 at 37 [Ex. A to Munkwitz Aff.]; Dkt. No. 59, Part 1, ¶ 5 [Plf.'s Response to Connolly Aff., not specifically controverting this fact]; Dkt. No. 59, Part 1, ¶ 18 [Plf.'s Response to Forte Aff., not specifically controverting this fact].)

[85]    (Dkt. No. 54, ¶ 5 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 5 [Plf.'s Response to Connolly Aff., not citing any evidence contradicting this fact].)

have in the area to which the inmate is being transported.[86]  In the absence of an emergency,

Defendant Connolly does not lightly modify plans with respect to inmate transportation.[87]

43.     In this case, Defendant Connolly considered the fact that (1) Plaintiff's

appointment in Albany was geographically close to Rensselaer County, (2) Plaintiff was

convicted in Rensselaer County, (3) Plaintiff's wife still resides in Rensselaer County, and (4)

Plaintiff is six feet nine inches tall.[88]  In addition, Defendant Connolly believed that Plaintiff was

serving a life sentence without the possibility of parole for killing his 27-year-old sister-in-law

and beating her three-year-old daughter.[89]

---

[86]     (Dkt. No. 54, ¶ 4 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 4 [Plf.'s Response to
Connolly Aff., not citing any evidence contradicting this fact].)

[87]     (Dkt. No. 54, ¶ 14 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 14 [Plf.'s Response to
Connolly Aff., not specifically controverting this fact and not citing any evidence contradicting
this fact].)

[88]     (Dkt. No. 54, ¶ 5 [Connolly Aff.]; Dkt. No. 50 at 5 [Ex. A to Munkwitz Aff.];
Dkt. No. 59, Part 1, ¶ 5 [Plf.'s Response to Connolly Aff., not citing any evidence contradicting
this fact].)

[89]     (Dkt. No. 50 at 76 [Ex. A to Munkwitz Aff.]; Dkt. No. 54, ¶ 5 [Connolly Aff.];
Dkt. No. 59, Part 1, ¶ 5 [Plf.'s Response to Connolly Aff., not citing any evidence contradicting
this fact].)  I note that Plaintiff denies being convicted of beating the three-year-old child.  (Dkt.
No. 59, ¶ 5 [Plf.'s Response to Connolly Aff.].)  As an initial matter, I do not read Defendants'
factual assertion as implying that Plaintiff was in fact *convicted* of beating the three-year-old
child, only that he was serving a life sentence due, in part, to the fact that he had beaten the child.
(Dkt. No. 54, ¶ 5 [Connolly Aff.].)  This asserted fact would be supported by the reference to a
plea agreement, crime victims assistance fee, and final order of protection contained in Exhibit 9
to Plaintiff's memorandum of law.   (Dkt. No. 59, Part 2 [Ex. 9 to Plf.'s Mem. of Law].)  It
would also be supported by Plaintiff's deposition testimony, in which he admits that he had been
charged with the assault of his niece along with first-degree murder of his sister-in-law.  (Dkt.
No. 50 at 77 [Ex. A to Munkwitz Aff.].)  In any event, any factual dispute about whether Plaintiff
beat the child, or was convicted of beating the child, would be immaterial to the instant motion.
This is because the fact that there had been no such beating or conviction would not contradict
the fact in question, which concerns what Defendant Connolly *believed*, on or about March 11,
2002, about Plaintiff's having beaten a child.  In other words, Defendant Connolly could have

44.     Based upon these considerations, Defendant Connolly approved Plaintiff's transportation on the condition that Plaintiff remain restrained with handcuffs, leg irons, a waist chain, and a black box.[90]

45.     At the time Defendant Connolly approved Plaintiff's transportation, Defendant Connolly was not advised by a health care provider that Plaintiff's restraints would have to be removed.[91]   Accordingly, Defendant Connolly directed the correctional officers detailed to transport Plaintiff (the "transportation officers") not to remove any of Plaintiff's restraints without first contacting the Watch Commander.[92]

46.     At the Orthopedic Group, a health care provider asked the transportation officers to remove Plaintiff's restraints.[93]   Accordingly, the transportation officers contacted Defendant Connolly.[94]

47.     Because Plaintiff's March 11, 2002, medical appointment was not made on an

---

been mistaken.

[90]     (Dkt. No. 54, ¶ 6 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 6 [Plf.'s Response to Connolly Aff., not specifically controverting this fact].)

[91]     (Dkt. No. 54, ¶ 7 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 7 [Plf.'s Response to Connolly Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

[92]     (Dkt. No. 54, ¶ 7 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 7 [Plf.'s Response to Connolly Aff., not specifically controverting this fact].)

[93]     (Dkt. No. 54, ¶ 8 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 8 [Plf.'s Response to Connolly Aff., admitting this fact].)

[94]     (Dkt. No. 54, ¶ 8 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 8 [Plf.'s Response to Connolly Aff., admitting this fact].)

emergency basis, Defendant Connolly had no reason to believe that Plaintiff suffered from a serious injury or that Plaintiff would be harmed by any delay.[95]  On the other hand, Defendant Connolly was well aware of the risks associated with removing Plaintiff's restraints.[96]  For these security reasons, Defendant Connolly directed the transportation officers to keep Plaintiff fully restrained, and that, if the health care providers at the Orthopedic Group could not treat Plaintiff while he wore his restraints, the officers were to return Plaintiff to Shawangunk C.F.[97]

48.     Rather than make a quick decision with respect to removing Plaintiff's restraints, Defendant Connolly desired to exercise caution.[98]  He felt that his decision permitted him to gather all of the necessary information, analyze the risks and benefits, and determine a course of action that accommodated Plaintiff's needs while ensuring the least threat to public safety.[99]

49.     At some point between March 11, 2002, and March 20, 2002, Defendant Connolly spoke to a health care provider at the Orthopedic Group and advised him or her of the risks

---

[95]     (Dkt. No. 54, ¶ 9 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 9 [Plf.'s Response to Connolly Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

[96]     (Dkt. No. 54, ¶ 9 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 9 [Plf.'s Response to Connolly Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

[97]     (Dkt. No. 54, ¶ 10 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 10 [Plf.'s Response to Connolly Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

[98]     (Dkt. No. 54, ¶ 14 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 14 [Plf.'s Response to Connolly Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

[99]     (Dkt. No. 54, ¶ 14 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 14 [Plf.'s Response to Connolly Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

associated with removing Plaintiff's restraints.[100]  In light of these risks, a health care provider at

the Orthopedic Group advised Defendant Connolly that only one of Plaintiff's restraints required

removal.[101]  Thereafter, Plaintiff was scheduled for an appointment to be held on March 20,

2002, which was nine days after his initial appointment (on March 11, 2002).[102]

     50.     On March 20, 2002, during Plaintiff's transportation to his appointment at the

Orthopedic Group, the conditions of Plaintiff's transportation were modified so as to permit the

transportation officers to remove one of Plaintiff's leg restraints and connect that shackle to

Plaintiff's waist chain.[103]  (The shackled leg would still be restrained because it would be

connected to the waist chain.[104])  The rescheduled appointment took place; and, during that

appointment, Dr. Alley was able to examine Plaintiff and recommend an arthrogram.[105]

---

[100]     (Dkt. No. 54, ¶ 11 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 11 [Plf.'s Response to Connolly Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

[101]     (Dkt. No. 54, ¶ 11 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 11 [Plf.'s Response to Connolly Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

[102]     (Dkt. No. 54, ¶ 12 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 12 [Plf.'s Response to Connolly Aff., admitting this fact].)

[103]     (Dkt. No. 54, ¶ 12 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 12 [Plf.'s Response to Connolly Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

[104]     (Dkt. No. 54, ¶ 12 [Connolly Aff.]; Dkt. No. 59, Part 1, ¶ 12 [Plf.'s Response to Connolly Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

[105]     (Dkt. No. 56, ¶ 18 [Forte Aff.]; Dkt. No. 50 at 38-39 [Ex. A to Munkwitz Aff.]; Dkt. No. 59, Part 1, ¶ 18 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

**Consequences of Plaintiff's Not Receiving an Arthrogram or
for any Delay Between His Initial Orthopedic Consultation and His Surgery**

51.     On April 9, 2002, Defendant Forte requested that Plaintiff receive an

arthrogram.[106]

52.     On April 23, 2002, Plaintiff was seen by Howard Katz, M.D., an orthopedic

surgeon.[107]  Rather than perform an arthrogram, Dr. Katz recommended Plaintiff for arthroscopic

surgery.[108]

53.     On April 24, 2002, Defendant Forte submitted a request for Plaintiff to receive

arthroscopic surgery.[109]

54.     On or about June 13, 2002, Dr. Katz performed arthroscopic surgery on Plaintiff's

left knee, including a "partial lateral menisectomy, shaving chondroplasty, sub-total synovectomy

and debridement of a partially torn approximately ½ ACL [anterior cruciate ligament]."[110]

---

[106]     (Dkt. No. 56, ¶ 18 [Forte Aff.]; Dkt. No. 56 at 169 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 18 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

[107]     (Dkt. No. 56, ¶ 19 [Forte Aff.]; Dkt. No. 56 at 169 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 19 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

[108]     (Dkt. No. 56, ¶ 19 [Forte Aff.]; Dkt. No. 59, Part 1, ¶ 19 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

[109]     (Dkt. No. 56, ¶ 19 [Forte Aff.]; Dkt. No. 56 at 168 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 19 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

[110]     (Dkt. No. 56, ¶ 20 [Forte Aff.]; Dkt. No. 56 at 159-163 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 20 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact, but admitting the fact that Dr. Katz performed arthroscopic surgery on Plaintiff's left knee in June of 2002]; Dkt. No. 59, Part 1, ¶ 19 [Plf.'s

During this arthroscopic surgery, Dr. Katz noted damage to Plaintiff's ACL.[111]

55.     Based on the aforementioned notation by Dr. Katz, and based on Plaintiff's

subsequent request to receive reconstructive surgery on his left knee, on or about June 11, 2003,

Dr. Forte referred Plaintiff to R. Mitchell Rubinovich, M.D., an orthopedic surgeon, to determine

whether Plaintiff required ACL reconstruction.[112]

56.     At some point between June 11, 2003, and July 17, 2003, Dr. Rubinovich

concluded that ACL construction was not appropriate based on (1) the progression of Plaintiff's

condition, (2) the fact that ACL reconstruction is generally not a required surgery, and that

depending on age, lifestyle, and level of activity, many patients with torn or ruptured ACLs opt

not to undergo surgery, (3) Dr. Rubinovich's medical opinion that Plaintiff's complaints were

caused by osteoarthritis rather than his ACL, and (4) Dr. Rubinovich's medical opinion that

osteotemy was more appropriate.[113]

---

Response to Forte Aff., admitting the fact that Dr. Katz performed arthroscopic surgery on Plaintiff's left knee]; Dkt. No. 53, ¶ 10 [Rubinovich Aff.]; Dkt. No. 59, Part 1, ¶ 10 [Plf.'s Response to Rubinovich Aff., not specifically controverting this fact and not citing any evidence contradicting this fact, but admitting the fact that Dr. Katz performed the referenced procedure on Plaintiff's left knee].)

[111]     (Dkt. No. 56, ¶ 20 [Forte Aff.]; Dkt. No. 56 at 159-163 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 20 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact, but apparently admitting the fact that Dr. Katz's surgery resulting in a finding that Plaintiff's ACL was "½ torn"].)

[112]     (Dkt. No. 56, ¶ 20 [Forte Aff.]; Dkt. No. 56 at 84 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 20 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact, but apparently admitting the fact that Dr. Forte "sent plaintiff to Dr. Rubinovich"].)

[113]     (Dkt. No. 53, ¶ 11 [Rubinovich Aff.]; Dkt. No. 56 at 84 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 4 [Plf.'s Response to Rubinovich Aff., not specifically denying these facts];

57.     On or about July 22, 2003, Dr. Forte submitted a request for Plaintiff to receive the surgery that Dr. Rubinovic recommended (i.e., osteotemy surgery on Plaintiff's left knee).[114]

58.     It appears that, on or about October 22, 2003 (after Defendants filed the instant motion for summary judgment), Dr. Rubinovich performed osteotemy surgery on Plaintiff's left knee.[115]

59.     It is Dr. Rubinovich's medical opinion that Plaintiff has suffered no harm as a result of not receiving an arthrogram (recommended by Dr. Alley on March 20, 2002, and requested by Defendant Forte on April 9, 2002) or for any delay between his initial orthopedic consultation (on December 19, 2001) and his arthroscopic surgery (on or about June 13, 2002).[116]

60.     With regard to his left-knee condition, Plaintiff has received (1) anti-inflammatory medications, (2) knee braces, (3) physical therapy, and (4) two surgeries (i.e., arthroscopic surgery on or about June 13, 2002, and osteotemy surgery on or about October 22, 2003).[117]

---

Dkt. No. 56, ¶ 20 [Forte Aff.]; Dkt. No. 59, Part 1, ¶ 20 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact, but admitting the fact that Dr. Rubinovich opted for an osteotemy over an ACL reconstruction].)

[114]     (Dkt. No. 56, ¶ 21 [Forte Aff.]; Dkt. No. 56 at 82 [Ex. A to Forte Aff.]; Dkt. No. 59, Part 1, ¶ 20 [Plf.'s Response to Forte Aff., not specifically controverting this fact and not citing any evidence contradicting this fact].)

[115]     (Dkt. No. 59, Part 1, ¶ 20 [Plf.'s Response to Forte Aff., admitting this fact]; Dkt. No. 59, Part 1, ¶¶ 7, 10 [Plf.'s Response to Rubinovich Aff., admitting this fact].)

[116]     (Dkt. No. 53, ¶ 10 [Rubinovich Aff.]; Dkt. No. 59, Part 1, ¶ 10 [Plf.'s Response to Rubinovich Aff., not specifically controverting this fact and not citing any evidence contradicting this fact, but apparently admitting the fact that this was Dr. Rubinovich's medical opinion].)

[117]     (Dkt. No. 53, ¶ 9 [Rubinovich Aff.]; Dkt. No. 59, Part 1, ¶ 9 [Plf.'s Response to Rubinovich Aff., not specifically controverting this fact and not citing any evidence contradicting this fact, but effectively admitting this fact]; Dkt. No. 59, Part 1, ¶ 20 [Plf.'s Response to Forte

III.    ANALYSIS

   A.    Whether Plaintiff's "First Claim" Should Be Dismissed Because of His
         Failure to Establish a Claim for Deliberate Indifference to a Serious Medical
         Need

   In their memorandum of law, Defendants argue that Plaintiff's "First Claim" (for

allegedly failing to answer his emergency medical call on February 1, 2002) should be dismissed

because Plaintiff has failed to establish either of the two elements of a medical indifference claim

under the Eighth Amendment.  (Dkt. No. 51 at 14-17 [Defs.' Mem. of Law].)  Liberally

construed, Plaintiff's response papers argue that (1) the high level of pain he was experiencing

gave rise to a *serious medical need*, and (2) Defendants Goord, Portuondo, and Cornelia acted

*deliberately* because they were aware of that pain.  (Dkt. No. 59, Part 2 at 10-12 [Plf.'s Mem. of

Law].)

   "To establish an unconstitutional denial of medical care [under the Eighth Amendment], a

plaintiff must prove a deliberate indifference to serious medical needs."  *Evering v. Lt. Rielly*, 98-

CV-6718, 2001 U.S. Dist. LEXIS 15549, at *29 (S.D.N.Y. Sept. 25, 2001) (citing *Estelle v.

Gamble*, 429 U.S. 97 [1976] and *Chance v. Armstrong*, 143 F.3d 698, 702 [2d Cir. 1998]).  This

claim's first prong (serious medical need) is objective while the claim's second prong (deliberate

indifference) is subjective.  *Evering*, 2001 U.S. Dist. LEXIS 15549 at *29 (citing *Hathaway v.

Coughlin*, 37 F.3d 63, 66 [2d Cir. 1994]).

   With regard to the first prong, Judge Sharpe (while a magistrate judge) has stated:

_____

Aff., admitting that he received osteotemy surgery on his left knee on October 22, 2003]; Dkt.
No. 59, Part 1, ¶¶ 7, 10 [Plf.'s Response to Rubinovich Aff., admitting that he received
osteotemy surgery on his left knee on October 22, 2003].)

> While there is no exact definition of a 'serious medical condition' in
> this circuit, the Second Circuit has indicated some of the factors to be
> considered when determining if a serious medical condition exists,
> including '[t]he existence of any injury that a reasonable doctor or
> patient would find important and worthy of comment or treatment; the
> presence of a medical condition that significantly affects an
> individual's daily activities; or the existence of chronic and
> substantial pain.'

*Crosswell v. McCoy*, 01-CV-0547, 2003 WL 962534, at *6 (N.D.N.Y. March 11, 2003) (Sharpe,

M.J.) (citing *Chance*, 143 F.3d at 702-703); *see also Evering*, 2001 U.S. Dist. LEXIS at *29 ("To

be sufficiently serious the deprivation must contemplate 'a condition of urgency, one that may

produce death, degeneration or extreme pain.'") (quoting *Hathaway*, 27 F.3d at 66 [citation

omitted]).

With regard to the second prong, a plaintiff must show that the charged official acted with

"a sufficiently culpable state of mind." *Evering*, 2001 U.S. Dist. LEXIS 15549 at *30 (citing

*Wilson v. Seiter*, 501 U.S. 294, 298 [1991]); *Hathaway*, 37 F.3d at 66 (citation omitted). "'The

required state of mind, equivalent to criminal recklessness, is that the official knows of and

disregards an excessive risk to inmate health or safety; the official must both be aware of facts

from which the inference could be drawn that a substantial risk of serious harm exists; and he

must also draw the inference.'" *Evering*, 2001 U.S. Dist. LEXIS 15549 at *30 (quoting

*Hemmings v. Gorczyk*, 134 F.3d 104, 108 [2d Cir. 1998]); *see also Chance*, 143 F.3d at 702

(citing *Farmer v. Brennan*, 511 U.S. 825, 837 [1994]).

In short, to satisfy this second prong, "[t]he conduct alleged must be 'repugnant to the

conscience of mankind.'" *Tomarkin v. Ward*, 534 F. Supp. 1224, 1230 (S.D.N.Y. 1982) (quoting

*Estelle*, 429 U.S. at 104). "It is well-established that mere disagreement over the proper

34

treatment does not create a constitutional claim.  So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."  *Chance*, 143 F.2d at 703 (citing *Dean v. Coughlin*, 804 F.2d 207, 215 [2d Cir. 1986]); *see also Evering*, 2001 U.S. Dist. LEXIS 15549 at *33-34 (citations omitted); *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y. 1992) (citations omitted).  "[N]egligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim."  *Chance*, 143 F.3d at 703 (citing *Estelle*, 429 U.S. at 105-06).

Here, Plaintiff has failed to establish the first prong of the above test.  The evidence in the record does not indicate that Plaintiff's medical condition was "urgent" under *Hathaway v. Coughlin*, 37 F.3d 63 (2d Cir. 1994).  (*See*, *supra*, Statement of Fact Nos. 34-35.)  Specifically, even if assumed to be true, Plaintiff's allegations of pain in his left knee and ankle, and his nausea and dizziness, did not threaten to produce *death or degeneration*, or produce *extreme* pain under the law.  *See Baczkowski v. N.Y. State Dept. of Corr.*, 04-CV-6192, 2004 U.S. Dist. LEXIS 12229, at *12-15 (W.D.N.Y. June 24, 2004) ("cold sweats, nausea and vomiting" resulting from medications, combined with "discomfort" resulting from slip on wet floor, did not constitute a serious medical need).[118]

Even if Plaintiff has established the first prong of the above test, he has failed to establish the second prong of that test.  No evidence exists suggesting that Defendants Goord, Portuondo,

---

[118]     *See also Qader v. New York*, 05-CV-0052, 2005 U.S. Dist. LEXIS 26958, at *8 (S.D.N.Y. Oct. 31, 2005) (plaintiff's dizziness and "terrible headache" did not constitute a serious medical need); *Gill v. Jones*, 95-CV-9031, at *23, 2001 U.S. Dist. LEXIS 17674 (S.D.N.Y. Nov. 1, 2001) ("headaches, earaches, and dizziness [experienced] intermittently for a maximum of four days" in conjunction with "facial bruising" did not constitute a serious medical need).

and Cornelia, acted with criminal recklessness with regard to Plaintiff's medical needs.  (*See*, *supra*, Statement of Fact Nos. 34-35.)  For example, it is an undisputed fact that, at the time of Plaintiff's emergency medical call on February 1, 2002, Defendant Cornelia was not advised by C.O. Horton (or anyone) that Plaintiff's medical call was based on nausea and dizziness due to his medications.  (*See*, *supra*, Statement of Fact No. 33.)  As a result, the reason that Defendant Cornelia declined to see Plaintiff on February 1, 2002, was not because of any deliberate indifference but because she believed that she was unable to provide additional medical treatment for Plaintiff (other than what had already been, and what was going to be, provided).  (*See*, *supra*, Statement of Fact No. 34.)

As a result, I recommend that the Court dismiss Plaintiff's "First Claim."

**B.     Whether Plaintiff's "Second Claim" Should Be Dismissed Because of His Failure to Establish a Claim for Deliberate Indifference to a Serious Medical Need and/or Because of His Failure to Exhaust His Administrative Remedies**

In their memorandum of law, Defendants argue that Plaintiff's "Second Claim" (for allegedly refusing to renew his permit for crutches on February 18, 2002) should be dismissed because (1) Plaintiff has failed to establish either of the two elements of a medical indifference claim under the Eighth Amendment, and (2) Plaintiff failed to exhaust his administrative remedies.  (Dkt. No. 51 at 14-19 [Defs.' Mem. of Law].)  Liberally construed, Plaintiff's response papers argue that (1) the high level of pain he was experiencing gave rise to a serious medical need, and (2) Defendants Goord, Portuondo, and Cornelia acted deliberately because they were aware of that pain.  Noticeably absent from Plaintiff's response is any argument regarding his failure to exhaust administrative remedies.  (Dkt. No. 59, Part 2 at 10-12 [Plf.'s

36

Mem. of Law].)

### 1.    Failure to Establish Claim

As explained above, to establish an unconstitutional denial of medical care under the

Eighth Amendment, a plaintiff must prove that the defendant acted with (1) "deliberate

indifference" (a subjective element) to the plaintiff's (2) "serious medical need" (an objective

element).

Here, the evidence in the record does not indicate that Plaintiff's medical condition was

"urgent" under *Hathaway v. Coughlin*, 37 F.3d 63 (2d Cir. 1994).  Specifically, even if Plaintiff's

allegations are true that, on February 18, 2002, Defendant Corneia refused to renew (or continue)

Plaintiff's permit for crutches for a period of one month, that refusal did not threaten to produce

*death or degeneration*, or produce *extreme* pain, under the circumstances.  (*See*, *supra*, Statement

of Fact Nos. 35-40.)

Even if Plaintiff has established a serious medical need, no evidence exists suggesting

that Defendants Goord, Portuondo, and Cornelia, acted with criminal recklessness with regard to

that need.  (*See*, *supra*, Statement of Fact Nos. 35-40; *see also Pittman v. Forte*, 01-CV-0100,

2002 U.S. Dist. LEXIS 19944, at *13 (N.D.N.Y. 2002) (Sharpe, M.J.) (denial of walking aid did

not constitute deliberate indifference to serious medical need where there was no evidence that

walking aid was withheld "for the sole purpose of causing plaintiff unnecessary pain").  For

example, on February 18, 2002, Defendant Cornelia *reasonably* believed that Plaintiff's permit

for crutches, issued on January 18, 2002, was for a one-month period of time–even if Defendant

Cornelia was factually mistaken in holding that belief.  (*See*, *supra*, Statement of Fact No. 39.)

As a result, I recommend that the Court dismiss Plaintiff's "Second Claim."

### 2.    Failure to Exhaust Administrative Remedies

The Second Circuit has recently held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the Prison Litigation Reform Act ("PLRA").  *See Hemphill v. State of New York*, 380 F.3d 680, 686, 691 (2d Cir. 2004).  First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner."  *Hemphill*, 380 F.3d at 686 (citation omitted).  Second, if those remedies were available, "the court should . . . inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it . . . or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense."  *Id.* (citations omitted).  Third, if the remedies were available and some of the defendants did not forefeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements."  *Id*. (citations and internal quotations omitted).

I conclude that, for the purposes of this motion, (1) administrative remedies were "available" to Plaintiff with regard to his denial-of-crutches claim, (2) Defendants have not forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it (nor have Defendants' actions estopped them from arguing that Plaintiff failed to exhaust his administrative remedies), and (3) Plaintiff has not established facts indicating that "special circumstances" exist

38

justifying his failure to exhaust his available administrative remedies.  I base these conclusions, in part, on (1) the fact that Plaintiff admitted in his Complaint that, during the time in question, Shawangunk C.F. had a prisoner grievance procedure (Dkt. No. 1 at ¶ 4.a.), (2) the fact that Plaintiff admitted in his deposition that he did not grieve the crutches issue, although he grieved other issues against Defendant Cornelia (Dkt. No. 50 at 28-29 [Ex. A to Munkwitz Aff.]), and (3) the fact that Plaintiff does not controvert Defendants' failure-to-exhaust argument in his response papers (*see*, *e.g.*, Dkt. No. 59 at 10-12 [Part 2 to Plf.'s Response]).[119]

As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's "Second Claim" on the grounds of Plaintiff's failure to exhaust his administrative remedies as to that claim.

**C.      Whether Plaintiff's "Third Claim" Should Be Dismissed Because of His Failure to Establish a Claim for Deliberate Indifference to a Serious Medical Need and/or Because of Defendant Connolly's Qualified Immunity**

In their memorandum of law, Defendants argue that Plaintiff's "Third Claim" (for continuing to restrain Plaintiff in leg shackles during a medical visit on March 11, 2002) should be dismissed because (1) Plaintiff has failed to establish either of the two elements of a medical indifference claim under the Eighth Amendment, and (2) even if Plaintiff had established those two elements, Defendant Connolly would be protected from liability by the doctrine of qualified

---

[119]      By failing to oppose Defendants' legal argument, Plaintiff is deemed to have "consented" to that legal argument.  *See Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendant in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendant with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]).

immunity.  (Dkt. No. 51 at 14-17, 19-20 [Defs.' Mem. of Law].)  Liberally construed, Plaintiff's response papers argue that (1) the high level of pain he was experiencing gave rise to a serious medical need, and (2) Defendants Goord, Portuondo, and Connolly acted deliberately because they were aware of that pain.  (Dkt. No. 59, Part 2 at 6-7, 8-10, 12-14 [Plf.'s Mem. of Law].)

### 1.    Failure to Establish Claim

As explained above, to establish an unconstitutional denial of medical care under the Eighth Amendment, a plaintiff must prove that the defendant acted with (1) "deliberate indifference" (a subjective element) to the plaintiff's (2) "serious medical need" (an objective element).

Here, the evidence in the record does not indicate that Plaintiff's medical condition was "urgent" under *Hathaway v. Coughlin*, 37 F.3d 63 (2d Cir. 1994).  Specifically, Defendant Connolly's order to corrections officers to keep Plaintiff in leg shackles during his medical visit on March 11, 2002, did not threaten to produce *death or degeneration*, or produce *extreme* pain, under the law.  (*See*, *supra*, Statement of Fact Nos. 41-50, 59.)[120]

Even if Plaintiff has established a serious medical need, no evidence exists suggesting that Defendants Goord, Portuondo, and Connolly, acted with criminal recklessness with regard to

---

[120]     *See Taylor v. Kurtz*, 00-CV-0700, 2004 WL 2414847, at *3 (W.D.N.Y. Oct. 28, 2004) (no "serious injury" where plaintiff suffered re-tear of surgically repaired ACL, tear of lateral meniscus ligament, and moderate to severe degenerative changes in knee); *Espinal v. Coughlin,* 98-CV-2579, 2002 WL 10450, at *4 (S.D.N.Y. Jan. 3, 2002) (no "serious medical need" where plaintiff suffered from ruptured ACL and knee surgery was delayed for three years while he underwent less invasive treatment); *Culp v. Koenigsmann,* 99-CV-9557, 2000 WL 995495, at *4 (S.D.N.Y. July 19, 2000) (no "serious injury" where plaintiff suffered from torn meniscus and knee surgery was delayed for approximately one year).

that need.  (*See*, *supra*, Statement of Fact Nos. 41-50.)  The evidence does not even suggest that

they acted negligently.  For example, the evidence is clear that Defendant Connolly (1) scheduled

the initial appointment for Plaintiff, (2) cancelled that appointment because the resulting security

concern was, in his opinion, greater than Plaintiff's medical need, and (3) rescheduled the

appointment when the security concern was alleviated.  (*Id*.)  This care was adequate for Eighth

Amendment purposes.  As the Second Circuit has explained:

> It must be remembered that the State is not constitutionally obligated,
> much as it might be desired by inmates, to construct a perfect plan for
> [medical] care that exceeds what the average reasonable person would
> expect or avail herself of in life outside the prison walls.  The [Bedford
> Hills] correctional facility is not a health spa, but a prison in which
> convicted felons are incarcerated.  Common experience indicates that
> the great majority of [Bedford Hills] prisoners would not in freedom or
> on parole enjoy the excellence in [medical] care which the plaintiffs
> understandably seek on their behalf.  We are governed by the principle
> that the objective is not to impose upon a state prison a model system
> of [medical] care beyond average needs but to provide the minimum
> level of [medical] care required by the Constitution.

*Dean v. Coughlin*, 804 F.2d 207, 215 (2d. Cir. 1986) (internal quotations and citation omitted).

As a result, I recommend that the Court dismiss Plaintiff's "Third Claim."

### 2.      Defendant Connolly's Qualified Immunity

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless

defendant's alleged conduct, when committed, violated 'clearly established statutory or

constitutional rights of which a reasonable person would have known.'" *Williams v. Smith*, 781

F.2d 319, 322 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 815 [1982]).  Regarding the issue of

whether a particular right was *clearly established*, courts in this Circuit consider three factors:

41

> (1) whether the right in question was defined with 'reasonable
> specificity'; (2) whether the decisional law of the Supreme Court and
> the applicable circuit court support the existence of the right in
> question; and (3) whether under preexisting law a reasonable
> defendant official would have understood that his or her acts were
> unlawful.

*Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991) (citations omitted), *cert. denied*, 503 U.S.

962 (1992).[121]  Regarding the issue of whether *a reasonable person would have known* he was

violating such a clearly established right, this "objective reasonableness"[122] test is met if "officers

of reasonable competence could disagree on [the legality of defendant's actions]."  *Malley v.*

*Briggs*, 475 U.S. 335, 341 (1986); *see also Malsh v. Corr. Officer Austin*, 901 F. Supp. 757, 764

(S.D.N.Y. 1995) (citing cases); *Ramirez v. Holmes*, 921 F. Supp. 204, 211 (S.D.N.Y. 1996).  As

the Supreme Court explained,

> [T]he qualified immunity defense . . . provides ample protection to all
> but the plainly incompetent or those who knowingly violate the law.
>
> . . . Defendants will not be immune if, on an objective basis, it is
> obvious that no reasonably competent officer would have concluded
> that a warrant should issue; but if officers of reasonable competence
> could disagree on this issue, immunity should be recognized.

*Malley*, 475 U.S. at 341.  Furthermore, courts in the Second Circuit recognize that "the use of an

'objective reasonableness' standard permits qualified immunity claims to be decided as a matter

---

[121]      *See also Calhoun v. New York State Division of Parole*, 999 F.2d 647, 654 (2d
Cir. 1993); *Prue v. City of Syracuse*, 26 F.3d 14, 17-18 (2d Cir. 1994).

[122]      *See Anderson v. Creighton*, 107 S.Ct. 3034, 3038 (1987) ("[W]hether an official
protected by qualified immunity may be held personally liable for an allegedly unlawful official
action generally turns on the 'objective reasonableness of the action.'") (quoting *Harlow*, 457
U.S. at 819); *Benitez v. Wolff*, 985 F.2d 662, 666 (2d Cir. 1993) (qualified immunity protects
defendants "even where the rights were clearly established, if it was objectively reasonable for
defendants to believe that their acts did not violate those rights").

of law." *Malsh*, 901 F. Supp. at 764 (citing *Cartier v. Lussier*, 955 F.2d 841, 844 [2d Cir. 1992] [citing Supreme Court cases]).

Here, even if Plaintiff had a "right" to be free of leg shackles during the medical visit in question, that right was not "clearly established" such that Defendant Connolly should have known he was violating that right through his actions. As shown above, Defendant Connolly's actions were well-reasoned, reasonably prompt, and wholly free from any suggestion of animus or bad faith. (*See*, *supra*, Statement of Fact Nos. 41-50.) As a result, absolutely no facts exist indicating that Defendant Connolly was either "plainly incompetent" or in *knowing* violation of any law. At the very least, officers of "reasonable competence" could have disagreed on the legality of Defendant Connolly's actions.

As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's "Third Claim" on the ground of qualified immunity.

### D.    Whether Plaintiff's "Fourth Claim" Should Be Dismissed Because of His Failure to Establish a Deliberate Indifference to a Serious Medical Need

In their memorandum of law, Defendants argue that Plaintiff's "Fourth Claim" (for allegedly failing, between January 2002 and March 2002, to promptly see Plaintiff, provide him with an MRI, and refer him to an orthopedic specialist in connection with Plaintiff's injuries to his left knee and left ankle) should be dismissed because Plaintiff has failed to establish either of the two elements of a medical indifference claim under the Eighth Amendment. (Dkt. No. 51 at 14-17 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) the high level of pain he was experiencing gave rise to a serious medical need, and (2) Defendants Goord, Portuondo, and Forte acted deliberately because they were aware of that pain. (Dkt. No.

43

59, Part 2 at 6-10 [Plf.'s Mem. of Law].)

As explained above, to establish an unconstitutional denial of medical care under the Eighth Amendment, a plaintiff must prove that the defendant acted with (1) "deliberate indifference" (a subjective element) to the plaintiff's (2) "serious medical need" (an objective element).

Here, the evidence in the record does not indicate that Plaintiff's medical condition was "urgent" under *Hathaway v. Coughlin*, 37 F.3d 63 (2d Cir. 1994).  Specifically, even if Plaintiff's allegations are true that, between January 2002 and March 2002, Defendants Forte and/or Cornelia delayed in seeing Plaintiff, failed to provide an MRI for Plaintiff, and failed to refer Plaintiff to an orthopedic specialist in connection with injuries to Plaintiff's left knee and left ankle, those failures did not threaten to produce *death or degeneration*, or produce *extreme* pain, under the law.  (*See*, *supra*, Statement of Fact Nos. 20-34, 59.)[123]

Even if Plaintiff has established a serious medical need, no evidence exists suggesting that Defendants Goord, Portuondo, Forte, or Cornelia acted with criminal recklessness with regard to that need.  (*See*, *supra*, Statement of Fact Nos. 20-34.)  For example, the evidence demonstrates that Defendant Forte acted promptly and dutifully in requesting medical procedures for Plaintiff, examining Plaintiff, referring Plaintiff for x-ray examinations, and prescribing medications for Plaintiff.  (*See*, *supra*, Statement of Fact Nos. 20-22, 25-26, 30-31.)  Defendant

---

[123]     *See Taylor*, 2004 WL 2414847, at *3 (no "serious injury" where plaintiff suffered re-tear of surgically repaired ACL, tear of lateral meniscus ligament, and moderate to severe degenerative changes in knee); *Espinal,* 2002 WL 10450, at *4 (no "serious medical need" where plaintiff suffered from ruptured ACL and knee surgery was delayed for three years while he underwent less invasive treatment); *Culp,* 2000 WL 995495, at *4 (no "serious injury" where plaintiff suffered from torn meniscus and knee surgery was delayed for approximately one year).

Portuondo acted appropriately and in good faith regarding Plaintiff's grievance requesting to be seen by a specialist to determine the extent of his ankle injury.  (*See*, *supra*, Statement of Fact Nos. 23, 27-29, 32.)  As explained earlier, Defendant Cornelia acted reasonably and in good faith regarding Plaintiff's emergency medical call on February 1, 2002.  (*See*, *supra*, Statement of Fact Nos. 33-34.)  Finally, no evidence exists that Defendant Goord knew anything about the alleged misconduct, much less took part in it.  (*See*, *supra*, Statement of Fact Nos. 20-34.)  Simply stated, Defendants' actions, while perhaps frustrating from Plaintiff's point of view, were adequate for Eighth Amendment purposes.

As a result, I recommend that the Court dismiss Plaintiff's "Fourth Claim."

**E.     Whether Plaintiff's Claims Against Defendants Goord and Portuondo Should Be Dismissed Because of Plaintiff's Failure to Establish Those Defendants' Personal Involvement in Any of the Alleged Constitutional Violations**

In their memorandum of law, Defendants argue that Plaintiff's claims against Defendants Goord and Portuondo should be dismissed because of Plaintiff's failure to establish their personal involvement in the alleged constitutional violations.  (Dkt. No. 51 at 22-24 [Defs.' Mem. of Law].)  Liberally construed, Plaintiff's response papers argue that Defendants Goord and Portuondo were personally involved in creating and allowing unconstitutional practices to occur.  (Dkt. No. 59, Part 2 at 15 [Plf.'s Mem. of Law].)

A defendant's personal involvement in the alleged unlawful conduct is a prerequisite for a finding of liability in a Section 1983 action.  *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977).  If the defendant is a supervisory official, such as a DOCS Commissioner or a prison superintendent, a mere "linkage"

45

to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of

*respondeat superior*) is insufficient to show his or her personal involvement in that unlawful

conduct. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Ayers v. Coughlin*, 780 F.2d

205, 210 (2d Cir. 1985).

Rather, in order for a supervisory official to be personally involved in unlawful conduct,

he or she must have (1) directly participated in that violation, (2) failed to remedy that violation

after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or

custom under which the violation occurred, (4) been grossly negligent in managing subordinates

who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by

failing to act on information indicating that the violation was occurring. *Colon v. Coughlin*, 58

F.3d 865, 873 (2d Cir. 1995); *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986).

Here, I find that Defendants Goord and Portuondo were not personally involved in the

alleged constitutional violations. Plaintiff attempts to make Defendants Goord and Portuondo

personally involved by citing letters he sent to them and grievances he appealed to them.[124]

However, Defendant Goord's and Defendant Portuondo's responses to Plaintiff's various letters

and grievances are not sufficient, *under the circumstances*, to establish such personal

involvement.[125]  This is because a careful review of the evidence in the record reveals that either

---

[124]     (Dkt. No. 59, Part 2 at 15 [Plf.'s Mem. of Law]; Dkt. No. 59, Part 2 [Exs. 4, 11, 12, 13, and 14 to Plf.'s Mem. of Law.].)

[125]     (*Id.*)  I recognize the conflict in this Circuit between district courts regarding whether a supervisor's denial of a grievance is sufficient to establish that supervisor's personal involvement in an alleged constitutional violation. *Compare McKenna v. Wright*, 01-CV-6571, 2004 WL 102752, at *6 (S.D.N.Y. Jan. 21, 2004) (discussing conflict, and concluding that such denial does establish personal involvement) *with Villante v. N.Y. State Dep't of Corr. Servs.*, 96-

(1) Plaintiff's various letters and grievances failed to notify Defendants Goord and Portuondo of any of the constitutional violations alleged in Plaintiff's Complaint, or (2) if those letters or grievances did contain such a notice, no evidence exists suggesting that Defendants Goord and Portuondo responded improperly to those letters or grievances.[126]  Furthermore, no evidence exists that Defendants Goord or Portuondo created (or allowed to continue) a policy or custom under which the alleged violations occurred, or that they were grossly negligent in supervising any subordinates who allegedly caused those violations.[127]

As a result, I recommend that, at the very least, the Court dismiss Plaintiff's claims against Defendants Goord and Portuondo due to their lack of personal involvement in the alleged violations.

---

CV-1484, 2001 U.S. Dist. LEXIS 25208, at 16-17 (N.D.N.Y. Oct. 25, 2001) (Homer, M.J.) (concluding that "[t]he fact that [Superintendent] Mann denied the [two] grievances does not establish any personal involvement by defendant Mann in the alleged denial of adequate medical care"), Report and Recommendation *adopted by* 2002 U.S. Dist. LEXIS 26279 (N.D.N.Y. March 28, 2002) (Mordue, J.), *aff'd*, 2003 U.S. App. LEXIS 2709 (2d Cir. Feb. 13, 2003) (unpublished decision cited herein only to show subsequent history of district court decision).  However, I need not resolve this conflict in order to conclude that Defendants Goord and Portuondo were not personally involved in any alleged constitutional violations, because (as described above) I find that (1) Plaintiff's various letters and grievances did not notify Defendants Goord and Portuondo of one of the constitutional violations alleged in Plaintiff's Complaint, and (2) in any event, Defendants Goord and Portuondo did not fail, in any way, in responding to Plaintiff's letters and grievances.

[126]      (Dkt. No. 59, Part 2 at 15 [Plf.'s Mem. of Law]; Dkt. No. 59, Part 2 [Exs. 4, 11, 12, 13, and 14 to Plf.'s Mem. of Law].)  *See also*, *supra*, Statement of Fact Nos. 23, 27-29, 32.

[127]      (*See*, *e.g.*, Dkt. No. 59, Part 2 at 15 [Plf.'s Mem. of Law] [failing to allege specifics of such a policy or custom, and failing to even argue negligent supervision].)

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 50) be

**GRANTED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days

within which to file written objections to the foregoing report.  Such objections shall be filed

with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN**

**DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85, 89 (2d

Cir. 1993) (citing *Small v. Sec'y of Health and Human Svcs.*, 892 F.2d 15 [2d Cir. 1989]); 28

U.S.C. § 636(b); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: November 30, 2005
       Syracuse, New York


George H. Lowe
United States Magistrate Judge

48